UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DANIEL GRINOLS,

                                Plaintiff,

             v.

BRANDON BEERS, et al.,

                              Defendants.
_____

<u>DECISION AND ORDER</u>

18-CV-6620L

## INTRODUCTION

On the evening of July 15, 2015, plaintiff Daniel Grinols, who was riding a motorcycle, was involved in a "road rage" incident with defendant Brandon Beers, who was driving an SUV, stemming from what each of them perceived to be reckless or aggressive driving by the other. At one point, both Grinols and Beers pulled off to the side of the road, and began yelling at each other. After a brief shouting match, which involved no physical contact between them or their vehicles, both Grinols and Beers drove off and went their separate ways.

There the matter might have ended, and probably should have, but it did not. The next day, Beers, who was a trooper with the New York State Police, reported the incident to his sergeant. Grinols ended up being arrested and charged by the State Police with three felonies, a misdemeanor, and four traffic violations, all stemming from the July 15 incident. All the charges were eventually dismissed or withdrawn.

Grinols filed the complaint in this action on August 27, 2018, against five individuals, all of whom were at all relevant times New York State troopers: Beers, Devon Dunn, Lindsay

Mark, Donald Rodbourn, and Kurt Eaton.  Plaintiff filed an amended complaint on October 31, 2018, asserting four causes of action.  Since then, plaintiff has voluntarily withdrawn two claims in their entirety and one claim, partially.  What remains are (1) a claim against defendants Beers, Mark, and Rodbourn for malicious prosecution, and (2) a claim against all five defendants for failing to intervene to stop the malicious prosecution from continuing.  Defendants have now moved for summary judgment dismissing the complaint.

## FACTUAL BACKGROUND

On July 15, 2014, around 9:30 pm, Grinols was riding a motorcycle, with a passenger, his girlfriend Alicia McLaughlin.  His friend Charles Fink was riding with him on another motorcycle.  They were heading west on County Route 70A in the Town of Hornellsville, NY.

Meanwhile, Beers, who was off duty, was driving his SUV.  His wife and two young children were also in the vehicle.   They were heading north on Seneca Road.

Grinols, Fink, and Beers all arrived at the intersection of Seneca Road and Route 70A at about the same time.  There is a four-way stop at the intersection, marked by stop signs.

All the vehicles stopped at the intersection.  Beers then proceeded, continuing north on Seneca Road.  Grinols and Fink turned right onto Seneca Road behind Beers.  At that point, they were all headed to their respective homes.[1]

---

[1]  There were two other motorcycles ahead of Grinols and Fink, which also stopped at the intersection. After Beers cleared the intersection, they stayed on Route 70A, westbound.  Grinols and Fink then turned north onto Seneca Road.  Except insofar as they form part of the background, the actions of the other two motorcyclists do not come into play in what ensued.

The parties agree on that much.  From there, their accounts begin to differ, often significantly.  According to Grinols, as he was riding behind Beers, he noticed that Beers's vehicle was drifting out of and back into its lane.  At an intersection with another four-way stop, Grinols alleges that he saw Beers's SUV go through the intersection without stopping.  He suspected that the driver of the SUV may have been drunk.

A short distance later, all three vehicles turned onto Airport Road, still headed north.  A short while later, Grinols passed Beers.  According to Grinols, Beers turned on his right turn signal and began pulling off to the right side of the road, seemingly with the intention of entering a parking lot at that spot.  Grinols passed him, and Beers immediately re-entered the lane and began following him.  The three vehicles continued northbound, with Grinols in the lead, Beers behind him, and Fink bringing up the rear.

Grinols states that Beers then began tailgating him and flashing his high beams.  Fearing for his safety, Grinols sped up to around 55 mph (the speed limit in that stretch of road was 35 mph), but Beers kept pace with him.

After continuing this way for a while, Grinols pulled off to the side of the road and turned off his motorcycle.  Beers pulled in behind him, and Fink arrived seconds later and pulled up on the left side of Beers's SUV.

In a nutshell, the following is Beers's account of what led up to this point in the narrative. After Beers proceeded through the intersection of Seneca Road and Route 70A, he noticed in his rearview mirror that two of the four motorcycles that had been stopped at that intersection were now behind him.  Beers alleges that the lead motorcyclist, *i.e.* Grinols, was weaving in and out of his lane, and accelerating and decelerating, sometimes coming dangerously close to Beers's

vehicle.  Beers alleges that *he* thought that *Grinols* may have been drunk.[2]  Beers admits what

Grinols claimed, that he rolled through a four-way stop without coming to a stop, but claims that

he did so because he was afraid that Grinols's motorcycle would hit his vehicle if he stopped.

According to Beers, Grinols soon passed him, in a no-passing zone.  Beers gave chase

and closed in on him, turning on his high beams in an effort to get plaintiff's license plate

number.  Beers testified at his deposition that at some point during this episode, "the cop [in him]

kind of kicked in, like, I got to get this," until his wife reminded him that their children were in

the car.  Beers Depo. (Dkt. #41-8) at 255.

Beers states that Grinols then abruptly came to a stop, and Beers did as well.  Fink soon

arrived and pulled up next to Beers's vehicle

While the two sides' accounts of what happened next differ in some particulars, it is clear

that Grinols got off his motorcycle, took a few steps toward the SUV, and both he and Beers

began shouting at each other.  Both sides appear to agree that Grinols's girlfriend, McLaughlin,

then pointed out to him that there were children in the back seat of Beers's vehicle, and

persuaded him to leave.  Grinols got back on his motorcycle, and he, Fink and Beers all drove

away.  But that did not end the matter, because of Beers's subsequent actions.

Beers made a phone call when he got home, to the North Hornell State Police barracks.

Beers spoke to Trooper Matt Brewer (who is not a party to this action) and told him about the

incident.  Apparently Brewer took no immediate action to follow up on Beers's report.[3]

---

[2] There is no proof or allegation that any of the participants were, in fact, under the influence of alcohol at the time.

[3] When he got home, Grinols also made a call to a friend, Marcus Smith, who was an investigator with the Steuben County Sheriff's Office, and told him what happened.  Grinols did not directly call any law enforcement

The next day, July 16, Beers went to work at the Bath State Police barracks, where he was stationed.  He reported the incident again, this time to his sergeant.  Investigator Donald Rodbourn was assigned to the case.

At around 11:00 that same morning, July 16, Grinols left his house in his vehicle (it seems to have been a pickup truck, but it was definitely not his motorcycle) with a passenger. Soon afterwards, he was pulled over by Trooper Devon Dunn, a co-worker of Beers, who was on patrol duty that morning.

Though they differ on some of the details, the parties' accounts of what happened next are generally consistent with each other.  Dunn, who like Beers was stationed at the Bath State Police barracks, knew that Grinols was a "person of interest" in connection with an ongoing investigation, *i.e.*, the investigation into Beers's report that he had made that morning.  How much Dunn knew about the investigation, or whether he knew that it was Grinols's vehicle that he was pulling over is unclear but ultimately of little importance here; at some point during this encounter, Dunn became aware that the driver of the vehicle was Grinols, *i.e.*, the person of interest mentioned above.

Dunn issued Grinols a ticket for driving without a front license plate.  This was the first of several charges lodged against Grinols.  Dunn also told Grinols that Grinols was the subject of an investigation and that Grinols could either drive directly to the State Police barracks in Bath to speak to Investigator Rodbourn, or be placed under arrest.  Not surprisingly, Grinols chose the former option.

---

agency, however, or otherwise formally report the incident, nor did Smith.

Dunn allowed Grinols to drop off his passenger, but followed Grinols on the way to the State Police building. On the way there, he again pulled Grinols over and issued him another ticket, for using a cell phone while driving. Plaintiff admits that he was on his phone, but claims that he had placed the call (to his lawyer) before pulling away from the curb, and that he was using his phone's Bluetooth or speaker, *i.e.*, hands-free, which is permitted in New York.

Grinols did speak with Rodbourn later that day, but after being advised of his *Miranda* rights, Grinols stated that he did not want to proceed further until after he had consulted a lawyer. On July 18, Grinols's then-attorney called Rodbourn and told him that Grinols was willing to go to the State Police barracks for an interview.

Grinols and his girlfriend, McLaughlin, arrived there later that afternoon. They gave their accounts of what had happened on July 15, but declined to sign a written statement. Apparently Grinols's lawyer was unable to attend, but Grinols waived his right to have an attorney present.

After further investigation and consulting with Steuben County District Attorney ("DA") Brooks Baker, on or about August 8, 2014 Rodbourn charged plaintiff with three felonies–Reckless Endangerment in the First Degree, Unlawful Imprisonment in the First Degree, and Falsifying Business Records in the First Degree–and one misdemeanor, Endangering the Welfare of a Child. Grinols was arrested, arraigned and released after agreeing to participate in the pretrial release program.

In the felony complaints, Rodbourn alleged that Grinols: (1) committed reckless endangerment by intentionally stopping his motorcycle in the northbound lane of Airport Road in order to cause Beers to abruptly stop his vehicle, which created "a grave risk of death" to the occupants of that vehicle, as well as to Grinols's passenger, McLaughlin; (2) committed unlawful

imprisonment by forcing Beers to come to a stop in the northbound lane, and by "not allow[ing] the trailing vehicle [*i.e.*, Beers's SUV] to leave"; and (3) committed the felony of falsifying business records by "caus[ing Rodbourn] to enter a record in the notes of an official New York State Police investigation ... for the purpose of concealing the commission of the crime of Endangering the Welfare of a Child ... ."  (Dkt. #38-2 at 42-44.)  The felony complaint does not state specifically what Grinols "caused" Rodbourn to enter in his notes.

Rodbourn also filed an information charging Grinols with the misdemeanor of endangering the welfare of a child.  He alleged that Grinols did so by forcing a vehicle (Beers's SUV) to stop and remain parked in the northbound lane of Airport Road, which placed in danger the children in the back seat of the SUV.  *Id.* at 45.

Rodbourn states that based on their conversation, DA Baker determined that Grinols should also be charged with four traffic violations:  driving to the left of pavement markings, speed not reasonable and prudent, no stopping/standing/parking on a highway, and reckless driving, all in violation of the New York Vehicle and Traffic Law.  Because investigators do not issue traffic tickets, Rodbourn asked Trooper Lindsey Mark to do so.

Eventually, all the charges were dismissed.  The record contains a certificate of disposition from Hornellsville Town Court (Dkt. #41-1) dated November 19, 2019, stating that each of the four traffic violation charges arising out the July 15 incident was withdrawn and dismissed.  Apparently the two tickets issued by Dunn (the license plate and cell phone tickets) also ended up being dismissed.  As to the felony and misdemeanor charges, Baker states in an affidavit that he did not personally prosecute those charges, but it is his understanding that they were dismissed on speedy-trial grounds.  Sheehan Decl. (Dkt. #38-2) Ex. T ¶ 6.

Plaintiff brought the present federal action in August 2018.  The parties have engaged in discovery, and defendants have moved for summary judgment.  The Court heard oral argument on the motion on November 24, 2020.

**Court of Claims Proceedings**

At some point–the exact date does not appear to be in the record–plaintiff filed an action involving the same incident against New York State in the New York Court of Claims, asserting causes of action for malicious prosecution, abuse of process and negligent hiring, training and retention of employees.  This filing and its resolution have significant impact on this federal action.

On August 6, 2019, Court of Claims Judge Catherine C. Schaewe issued a decision and order (Dkt. #41-5) granting in part the State's motion for summary judgment, and dismissing plaintiff's cause of action for negligent hiring, training and retention.  Judge Schaewe also found that there was probable cause to charge Grinols with a violation of VTL § 402(1) (driving without a front license plate), and that plaintiff therefore could not recover on his claim of malicious prosecution based on that charge.

In all other respects, Judge Schaewe denied the State's motion for summary judgment.  In so doing, she found that there was no probable cause to charge plaintiff with violations of Penal L. § 175.10 (falsifying business records) or § 135.10 (unlawful imprisonment), although the element of malice remained to be decided.  She also found that there were issues of fact concerning probable cause for the other charges, and that plaintiff had sufficiently pleaded a cause of action for abuse of process.

-8-

Grinols's remaining claims went to trial in the Court of Claims.  On Apr. 30, 2020, Judge Schaewe issued a decision (Dkt. #45) dismissing the action.  She found, first, that "a reasonably prudent person could ... have reached the reasonable belief that claimant had committed reckless endangerment, endangering the welfare of a child, and each and every one of the traffic offenses with which he was charged."  *Id.* at 25 (footnote omitted).  She therefore dismissed Grinols's malicious prosecution claims stemming from those charges.

As to the claims relating to unlawful imprisonment and falsifying business records, Judge Schaewe stated that "[r]egardless of the lack of probable cause for these two charges, ... it was clear to the Court, based upon the testimony and the evidence, that there was no malice involved in bringing any of the charges."  She stated that "Rodbourn and DA Baker were simply doing their jobs based upon the facts" and that although "Beers may have grossly misjudged the situation" on July 15, "he did not make the determination to issue the charges."  *Id.* at 26.  Those claims were therefore dismissed as well.

For similar reasons, the court also dismissed plaintiff's claim for abuse of process.  Judge Schaewe wrote that it was "clear that there was no intent by Rodbourn or Baker to do claimant any harm without excuse or justification."  *Id.* at 27.

**DISCUSSION**

**I. Court of Claims Decision**

    **A. General Principles**

Before addressing the parties' arguments about the specific claims here, the Court must determine what effect, if any, to give to Judge Schaewe's decisions in the Court of Claims action. Defendants contend that those decisions, particularly the trial decision, bar all of plaintiff's claims here.

The preclusive effect that a federal court sitting in New York should give to a judgment rendered in a New York state court is determined according to New York law. *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 265 (2d Cir. 1997) (citing *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)). *Accord Barnes v. Royal Health Care LLC*, 357 F.App'x 375, 376-77 (2d Cir. 2009).

Like federal courts, New York courts recognize two separate but related forms of preclusive effect to be given prior decisions by other tribunals: collateral estoppel and res judicata, also known as issue preclusion and claim preclusion.

"Collateral estoppel, or issue preclusion, bars the re-litigation of an issue that was previously decided, regardless of whether the two suits are based on the same cause of action." *Razzano v. Remsenburg-Speonk Union Free Sch. Dist.*, 751 F.App'x 24, 26 (2d Cir. 2018). "Issue preclusion, however, applies only if '(1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action.'" *Id.* at 26-27 (quoting *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006)).

So long as those criteria are met, collateral estoppel effect is to be given to the factual determinations of any "court of competent jurisdiction ... in subsequent suits ... involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979).  New York law governs the preclusive effect of a judgment from a New York state court, *see Migra*, 465 U.S. at 81, and there is "no significant difference" between New York preclusion law and federal preclusion law. *Pike v. Freeman*, 266 F.3d 78, 90 n.14 (2d Cir. 2001).

Notwithstanding the different procedural contexts of the cases, then, this Court must accept the factual findings of the Court of Claims, if those findings were necessarily and actually decided and plaintiff had a full and fair opportunity to litigate the underlying issues.  *See*, *e.g.*, *Jaffe v. Fitzgerald*, No. 06-CV-317, 2009 WL 804740, at *6 (E.D.N.Y. Mar. 27, 2009) ("identical issues" requirement met where Court of Claims decided "substantially the same specific legal or factual dispute ... in the prior action").  This Court has no power to disregard those findings or decide those factual issues *de novo*.  To do so would turn this Court into a super-appellate court sitting in review of state court decisions, which is clearly impermissible. *See Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Engineers*, 398 U.S. 281, 296 (1970) ("[L]ower federal courts possess no power whatever to sit in direct review of state court decisions").

"Res judicata bars re-litigation if '(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action.'" *Soules v. Connecticut*, 882 F.3d 52, 55 (2d Cir. 2018) (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000)).  "Whether a judgment in a prior action 'will have

preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first.'" *Morales v. N.Y.C. Dep't of Educ.*, 808 F.App'x 35, 37 (2d Cir. 2020) (quoting *Monahan*, 214 F.3d at 289).

Not surprisingly, the two sides differ in their views of what effect this Court should give to Judge Schaewe's summary judgment and trial decisions. Plaintiff has cited Judge Schaewe's findings in her summary judgment decision of no probable cause as to unlawful imprisonment and falsifying business records, while defendants argue that the Court of Claims' trial decision bars plaintiff's claims in this action completely.

Although defendants have referenced res judicata in their papers, they have not pressed an argument on that ground, and it is clear that if there is any basis upon which this Court could give preclusive effect to the Court of Claims' decisions, it would be collateral estoppel. The case law is uniform that res judicata does not apply to Court of Claims decisions in later lawsuits against individual state employees. *See Ceara v. Gilboy*, 2018 WL 4691043, at *2-*3 (W.D.N.Y. Sept. 28, 2018) (stating that "Since the Court of Claims does not have jurisdiction to hear claims against state officials in their individual capacities, courts have held that res judicata does not bar a later suit asserting claims against individuals") (citing cases).

In his papers in response to defendants' motion and his attorney's statements at oral argument, plaintiff has conceded that the Court of Claims' trial decision should be given collateral estoppel effect as to his malicious prosecution claim against Rodbourn. Plaintiff continues to press his malicious prosecution claims against Beers and Mark, however, and,

apparently, his failure-to-intervene claims.  Defendants continue to maintain that the trial

decision encompasses all the defendants in this action, and bars plaintiff's claims entirely.


**B. Claim against Mark**

The Court of Claims said very little about Trooper Mark in either the summary judgment

or trial decision.  The summary judgment decision states, "After Rodbourn completed his

investigation and consulted with DA Baker, Trooper Lindsey Mark issued" four traffic tickets,

and that "[b]ecause Mark did not personally observe any violations, all of the tickets were issued

solely upon the evidence gathered during Rodbourn's investigation ... ."  (Dkt. #41-5 at 23.)

The trial decision does not appear to mention Mark by name.  But Judge Schaewe did

expressly find that "[t]he ancillary traffic charges were ... based upon the circumstances related to

Rodbourn by Beers and [his wife], and a reasonably prudent person could form the reasonable

belief that claimant had committed those violations."  (Dkt. #45 at 26.)  Based on her finding that

probable cause existed for the issuance of the tickets, Judge Schaewe held that Grinols's "cause

of action [against the State] for malicious prosecution based upon any of these charges must

fail."  *Id.*

That finding clearly precludes plaintiff's claim here against Mark.  If Mark issued the

tickets based upon probable cause, no claim of malicious prosecution will lie.  *See Bullard v.

City of New York*, 240 F.Supp.2d 292, 297 (S.D.N.Y. 2003) ("[T]he existence of probable cause

to commence a proceeding is ... a complete bar to a claim of malicious prosecution").[4]

---

[4] As explained below, even if I did not give estoppel effect to the Court of Claims' findings in this regard, I
would dismiss the claim against Mark on the merits.

### C. Claim against Beers

In her trial decision, Judge Schaewe was focused largely on the actions of Rodbourn and Baker.  That was entirely understandable, since the Court of Claims action was brought against the State of New York, and Rodbourn and Baker were the two individuals acting most directly on behalf of the State in bringing charges against Grinols.  The gist of Judge Schaewe's findings and conclusions was that they acted reasonably, and were "simply doing their jobs in light of the facts as revealed in Rodbourn's investigation and as relayed [by Rodbourn] to Baker."  (Dkt. #45 at 26.)

Judge Schaewe did make some findings specifically relating to Beers, which generally do not cast him in a good light.  Judge Schaewe described Beers as the "aggressor in the situation" on July 15, and said that he may have "grossly misjudged the situation."  She also stated that Beers was "clearly complicit" in creating a situation that put his children in danger. *See* Dkt. #45 at 25 and n.10.

All of those findings, however, relate to the events of July 15, not to the decision to charge and prosecute plaintiff with various offenses.  Despite the abovementioned findings, Judge Schaewe held that New York State was not liable for Beers's actions because Beers "did not make the determination to issue the charges" against Grinols.  That determination was made by Rodbourn and Baker.

Significantly, Judge Schaewe also found that although "[t]he fact that Beers was an off-duty State Trooper may have contributed to Rodbourn's and Baker's view that he was credible, ... nothing in the investigation would have given them any reason to doubt his description of the events, particularly when they were essentially confirmed by claimant,

McLaughlin and Fink."  (Dkt. #45 at 21.)  Thus, despite her statement that "Beers may have grossly misjudged the situation" on the night of July 15, the Court of Claims judge indicated that Beers's account of the events that evening were largely accurate, and that they essentially jibed with Grinols's own account.  Judge Schaewe went on to find "that the encounter and subsequent charges [against Grinols] were the result of two vastly diverging perspectives on what happened that night, rather than on an actual difference of material facts."  (Dkt. #45 at 22.)

The Court of Claims thus made several findings that are directly relevant to plaintiff's claim against Beers in this action in federal court.  For one, she found that he did not make the decision to bring charges against Grinols.  For another, she found that despite the participants' different interpretations of what transpired on July 15, there was no material difference between their testimony as to what actually happened.

To that limited extent, I conclude that Judge Schaewe's findings regarding Beers are entitled to preclusive effect.  Specifically, she found that Beers was not one of those responsible for deciding to bring charges against Grinols, and that the differences between his and Grinols's accounts of the events of July 15 were attributable not to either of them lying about what happened that night, but to their very different, subjective impressions of the events.  Judge Schaewe necessarily and actually decided those matters, which plainly bear upon Grinols's claims against Beers here.

I do not, however, accept defendants' argument that the Court of Claims' trial decision in favor of the State automatically exonerates all state employees, including Beers, who had any involvement in the relevant events.  That would be tantamount to applying res judicata, which as stated is inapplicable in § 1983 actions against individual defendants, as to prior decisions in

Court of Claims actions against New York State.  While this Court will give due regard to Judge

Schaewe's factual findings, then, the Court must still address the merits of plaintiff's claim

against Beers, in light of those findings.


**II. Malicious Prosecution Claim Under 42 U.S.C.  § 1983**

      **A. General Principles**

       "Section 1983 itself creates no substantive rights; it provides only a procedure for redress

for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.

1993).  The statute provides a right of action for persons aggrieved by the deprivation of their

rights secured by either the Constitution or the laws of the United States.  *Taylor v. City of

Rochester*, 458 F.Supp.3d 133, 141 (W.D.N.Y. 2020).

       In order to state a claim under § 1983, a plaintiff must allege that a state actor, or a private

party acting under color of law, "deprived the plaintiff of a right guaranteed under the

Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation

omitted).  For a defendant to be held individually liable in an action under § 1983, the plaintiff

must show that the defendant was personally involved in the alleged deprivation.

       In the case at bar, plaintiff bases his claim against Beers and Mark on a theory of

malicious prosecution.  Malicious prosecution claims under § 1983 are "properly pled as Fourth

Amendment violation[s]."  *Williams v. Young*, 769 F. Supp. 2d 594, 603 (S.D.N.Y.  2011) (citing

*Albright v. Oliver*, 510 U.S. 266 (1994)).

       "'In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a

plaintiff must show a violation of his rights under the Fourth Amendment and must establish the

elements of a malicious prosecution claim under state law.'" *Frost v. N.Y. City Police Dep't*, 980

F.3d 231, 242 (2d Cir. 2020) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160-61

(2d Cir. 2010)).   "'To establish a malicious prosecution claim under New York law, a plaintiff

must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2)

termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the

proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Id.* (quoting

*Manganiello*, 612 F.3d] at 161).


### B. Claim against Mark

As explained above, I conclude that the Court of Claims' trial decision bars plaintiff's

claim against Mark, under the doctrine of collateral estoppel.  Mark's only involvement was to

write traffic tickets against plaintiff, and Judge Schaewe found that there was probable cause for

the issuance of the tickets.  Probable cause is a complete defense to a § 1983 malicious

prosecution claim.  *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).

Even absent the Court of Claims' findings, however, plaintiff's claim against Mark would

be subject to dismissal.  Plaintiff has acknowledged that "Rodbourn directed Mark to charge

Grinols" with the traffic violations.  *See* Pl. Mem. (Dkt. #41-16) at 18.  There is no evidence that

Mark had any reasonable basis to even question that directive, much less to refuse to write the

tickets, or that Mark acted with any malice toward plaintiff.  The claim against Mark must

therefore be dismissed on that ground as well.

### C. Claim against Beers

"Under 42 U.S.C. § 1983, constitutional torts are only actionable against state actors or private parties acting 'under the color of' state law." *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) (quoting *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002). The issue of whether an actor's conduct constitutes action "under color of law or as a state actor is a question of law for the court." *Fiedler v. Incandela*, 222 F.Supp.3d 141, 157 (E.D.N.Y. 2016) (quoting *Vega v. Fox*, 457 F.Supp.2d 172, 181 (S.D.N.Y. 2006)); *see also Blum v. Yaretsky*, 457 U.S. 991, 997-98 (1982) (noting that the question of whether there was state action was an issue of law "to be decided by the District Court"); *P.P. v. City of New York*, No. 13 CIV. 5049, 2014 WL 4704800, at *12 (S.D.N.Y. Sept. 19, 2014) (whether private individuals are state actors under § 1983 is a "threshold issue[ ] of law").

In support of their motion for summary judgment, defendants have argued that the claims against Beers should be dismissed because he was not a state actor. Defendants contend that Beers acted throughout these events not as a state trooper, but as a private citizen. He was off duty at the time of the incident, and, defendants assert, he simply reported the incident, as any other citizen could have done.[5]

There is evidence in the record that at least at some points during the investigation, Beers did not act, and was not treated as just another citizen, and that his status as a trooper did make a difference. These include the swift apprehension of Grinols following closely on the heels of

---

[5] That argument stands in apparent contradiction to defendants' assertion that Judge Schaewe's ruling in favor of the State in her trial decision necessarily encompasses all the state employees, including Beers, who played any role whatsoever in the relevant events. Defendants cannot have it both ways. As explained in the body of this Decision and Order, however, ultimately it is inconsequential whether Beers was a state actor or not.

-18-

Beers's report of the July 15 incident to his sergeant, and the fact that, contrary to normal or accepted practice, he was allowed to write his own supporting deposition, to sit in on a witness interview, and to question the witness directly. There is also some evidence that pressure was brought to bear on the witness, Smith, to fall in line and support a fellow law enforcement officer.

In addition, even if Beers did act as a private citizen, rather than in his capacity as a state trooper, that would not necessarily preclude a finding of liability under § 1983. Even a private citizen can be found to have acted under color of law under some circumstances, such as when he acts in concert with, or participates in joint activity with state actors, or knowingly provides state actors with false information, to induce them to act. *See, e.g.*, *Weiner v. McKeefery*, 90 F.Supp.3d 17, 45-46 (E.D.N.Y. 2015) ("a civilian complainant can be held liable for malicious prosecution if [he] intentionally provided false evidence to the police resulting in the plaintiff's arrest and prosecution") (citations and internal quotation marks omitted).

I conclude, however, that whether Beers was or was not a state actor, or whether he acted under color of law, is not ultimately determinative. Although Judge Schaewe had no reason to and did not decide whether Beers was a state actor, the findings she did make relative to Beers present an insurmountable obstacle to plaintiff's claim against him in this Court.

Despite her generally negative assessment of Beers's actions on the night of July 15, Judge Schaewe made a crucial finding that Beers "did not make the determination to issue the charges" against Grinols. While Beers's report and his account of the relevant events were obviously a significant factor in Rodbourn's and Baker's decisions, in the end it was not Beers who decided to charge Grinols, or what charges were appropriate.

-19-

That alone would not necessarily exculpate Beers, if he wrongfully induced the prosecution of Grinols by, for example, fabricating evidence or making false claims about what happened.  Both police officers and  civilians can be liable under § 1983 in such circumstances. *See*, *e.g.*, *Moroughan v. County of Suffolk*, __ F.Supp.3d __, 2021 WL 298714, at *26 (E.D.N.Y. Jan. 20, 2021); *Weiner v. McKeefery*, 90 F.Supp.3d 17, 45-46 (E.D.N.Y. 2015).

Although plaintiff contends that Beers did lie about the events of July 15, that allegation does not save his claim against Beers, for a couple of reasons.  First, as noted earlier, Judge Schaewe also found that Beers's "description of the events ... were essentially confirmed by claimant, McLaughlin and Fink," and that both the July 15 incident *and* "the ... subsequent charges" resulted not from "an actual difference of material facts" between Grinols's and Beers's accounts but from their "vastly diverging perspectives on what happened that night ... ."  The Court of Claims judge plainly concluded, then, that Beers did not make up material facts in an effort to mislead Rodbourn or Baker, or to wrongfully induce them to issue charges against Grinols.

 Second, plaintiff's assertion that Beers lied is noticeably short on details concerning *what* Beers supposedly lied about.  From the record, it appears that the sharpest points of divergence between his and Grinols's accounts concern:  (1) whether Grinols, while weaving from side to side on his motorcycle as he was following Beers, crossed a solid yellow line and entered the oncoming lane; (2) whether Beers pulled to the right, indicating an intention to turn right, to allow Grinols to pass him, or whether Grinols illegally passed him in a no-passing zone; and (3) whether, when Grinols and Beers both stopped and engaged in their confrontation, Grinols parked his motorcycle in the driving lane, or on the shoulder or side of the road.

In the overall context of the facts here, those discrepancies are relatively minor.  As the Court of Claims stated, the differences between the two sides' versions relate more to their differing impressions of the same events than to mutually exclusive, diametrically opposed accounts.  Both sides agree, for instance, that Grinols was weaving, and it would not be surprising if Grinols's and Beers's subjective perceptions of the extent of that weaving differed. There also seems to be no dispute that at the location where Grinols finally came to a stop, there was no shoulder on the side of the road, so he stopped close to the side, but still in the driving lane.  At any rate, even if Beers tended to paint a lurid picture of Grinols's actions, both the factual record in this case and the Court of Claims' findings show that he did not engage in the type of conscious, purposeful deceit that might support a § 1983 claim for malicious prosecution. *Cf. Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (finding summary judgment improper where a reasonable jury could find that officers fabricated a false confession and forwarded it on to prosecutors); *White v. Moylan*, 554 F.Supp.2d 263, 267 (D.Conn. 2008) (concluding that plaintiff properly pleaded state action by two private security guards who substituted in plaintiff's shopping bag unpurchased store merchandise for goods already purchased, resulting in plaintiff's arrest for shoplifting).

While Beers may have overreacted at the time of the incident, plaintiff's malicious prosecution claim against Beers does not arise directly from the July 15 incident, but from the eventual decision to charge Grinols with various offenses.  Given the Court of Claims' factual findings, and the lack of evidence that Beers was personally involved in or wrongfully influenced that decision, I conclude that Beers cannot be held liable for malicious prosecution.

### III. Failure to Intervene

Plaintiff has also asserted a cause of action for failure to intervene.  The claim is asserted against all the defendants, in a general fashion, alleging that all the defendants are liable for failing to intervene to halt the malicious prosecution of plaintiff.

The duty to intervene only arises, however, when a constitutional violation is ongoing or imminent.  In other words, there is no duty to "halt" a nonexistent violation.  *See Troy v. City of New York*, No. 13-CV-5082, 2014 WL 4804479, at *11 (S.D.N.Y. Sept. 25, 2014) ("In the absence of a constitutional violation, there can be no violation of the duty to intervene") (citing *Curley*, 268 F.3d at 72), *aff'd*, 614 F.App'x 32 (2d Cir. 2015)).

Since all of plaintiff's other claims have been dismissed, no predicate constitutional violation remains to support a failure-to-intervene claim.  This claim is therefore dismissed as well.  *See Wieder v. City of New York*, 569 F.App'x 28, 30 (2d Cir. 2014) (affirming dismissal of claim for failure to intervene where underlying constitutional claim was dismissed); *Walker v. City of New York*, No. 11-CV-00314, 2014 WL 12652345, at *12 (E.D.N.Y. Sept. 3, 2014) ("To prevail on a failure to intervene claim a plaintiff must demonstrate the existence of an underlying constitutional violation in which the defendant officer failed to intervene"), *aff'd*, 638 F.App'x 29 (2d Cir. 2016).

One final observation is warranted.  This was an unfortunate incident that could have and probably should have been settled quickly, if not amicably.  Instead, that one brief incident on the night of July 15, 2015 led to multiple criminal charges (which were apparently never prosecuted with vigor, if at all), a Court of Claims action, and now this federal civil rights action.  All of that could have been avoided had cooler heads prevailed, which, unfortunately, did not happen.

Although the Court dismisses the complaint in its entirety, then, that is not meant to be an endorsement of the defendants' actions here.  It is fair to say that few of the participants in this case acquitted themselves well.  But given the factual findings of the Court of Claims, and applying the law to the facts before me, I conclude that plaintiff's remaining claims must be dismissed, for the reasons stated above.

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #38) is granted, and the complaint is dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
April 5, 2021.